2015 OK CIV APP 13

**MATERIAL SERVICE CORPORATION,**
Plaintiff/Appellant,

v.

**TOWN OF FITZHUGH,**
Defendant/Appellee.

**No. 109,966.**

Court of Civil Appeals of Oklahoma,
Division No. 1.

Aug. 14, 2014.

Rehearing Denied Sept. 19, 2014.

Certiorari Denied Jan. 26, 2015.

Elizabeth C. Nichols, Elizabeth C. Nichols, P.C., Edmond, Oklahoma, for Plaintiff/Appellant.

Jason D. Christopher, Sweeney, Smith, Draper & Christopher, P.L.L.C., Ada, Oklahoma, for Defendant/Appellee.

WM. C. HETHERINGTON, JR., Vice–Chief Judge.

¶ 1 In the second appeal in the parties' zoning controversy, Plaintiff Material Services Corporation (MSC) appeals the trial court's declaratory judgment in favor of Defendant Town of Fitzhugh (Town), in Pontotoc County, Oklahoma, entered after a nonjury trial over the validity of Town's new zoning ordinance prohibiting MSC's proposed operation of a limestone quarry within the corporate limits.

### STANDARD OF REVIEW

¶ 2 Under the Declaratory Judgments Act, the determination of a competent court is reviewable in the same manner as other judgments. 12 O.S.2011 § 1654. "A suit for declaratory judgment pursuant to § 1651 is neither strictly legal nor equitable, but assumes the nature of the controversy at issue." *Macy v. Oklahoma City School Dist. No. 89*, 1998 OK 58, ¶ 11, 961 P.2d 804, 807.

¶ 3 The judgment on appeal is comprised of both findings of facts and conclusions of

law.[1] When a trial court's declaratory judgment order decides a question of law, we review the decision under a *de novo* standard, which requires review of the record to determine whether the trial court erred. *Cherokee Nation v. Nomura*, 2007 OK 40, ¶ 11, 160 P.3d 967, 972. When a proceeding under the Declaratory Judgment Act involves the determination of an issue of fact, such issue must be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending. 12 O.S.2011 § 1656.

■ ¶ 4 Proceedings in district court on appeals from Boards of Adjustment in zoning matters are generally characterized as being equitable in nature. The question on review of such cases is whether the judgment of the district court is clearly contrary to the weight of the evidence. *Triangle Fraternity v. City of Norman ex rel. Board of Adjustment*, 2002 OK 80, ¶ 11, 63 P.3d 1 (citing *Bankoff v. Board of Adjustment of Wagoner County*, 1994 OK 58, 875 P.2d 1138).

■ ¶ 5 Although this appeal is not brought from a district court's review of a board's zoning decision, the nature of this declaratory judgment action, *i.e.*, the validity of Town's zoning ordinance and whether it applies retroactively to MSC's 2003 Mining Lease, is also equitable, and we will sustain the trial court's ruling unless clearly contrary to the weight of the evidence. *Bankoff v. Board of Adjustment of Wagoner County*, 1994 OK 58, ¶ 14, 875 P.2d 1138, 1143. In equitable actions, this Court "presumes the

district court's findings of fact are correct and will not disturb such findings on appeal unless they are clearly contrary to the weight of the evidence." *Pine Island RV Resort, Inc. v. Resort Management, Inc.*, 1996 OK 83, ¶ 18, 922 P.2d 609, 613. Also the credibility of witnesses and the weight and value of their testimony are questions exclusively for the factfinder. *Id.* Finally, a correct judgment will be affirmed, regardless of the reasons given, if it is sustainable on any rational theory and the ultimate conclusion reached is legally correct. *Bankoff*, at ¶ 17.

## FACTUAL AND PROCEDURAL HISTORY

¶ 6 MSC is an Oklahoma corporation primarily in the business of crushing limestone for highways and other construction, who has as its President and manager, Larry Stewart. MSC is a wholly-owned subsidiary of Stewart Stone Inc., an Oklahoma corporation, a family business started in 1977 by Mr. Stewart's grandfather and father.

¶ 7 According to the record, parties' joint stipulated facts (JSF) adopted by the trial court, and uncontroverted trial testimony relevant to the background of this dispute, MSC "entered into a valid lease on January 3, 2003" with Jeffery and Julia Luke, "owners of Section 22, Township 2 North, Range 5 East, in Pontotoc County, for purposes of operating a mining quarry" (2003 Mining Lease).[2] JSF # 2. According to Mr. Stewart, the "only property right MSC was granted was the right to mine."[3]

1. We expressly reject MSC's seventh proposition alleging the judgment on appeal does not comply with 12 O.S.2011 § 611.

2. We note the joint stipulation's description of the Lukes as owners of "Section 22" conflicts with the actual description in the Lease as "Section 11" and as being approximately "200 acres more or less." MSC's Application for Permit To Engage in Non–Coal Mining also refers to "Section 11."

3. MSC's exhibit marked as "Exhibit No. 4," which Mr. Stewart testified was the lease agreement between MSC and Jeffrey and Julia Luke, signed January 3, 2003, was offered without any objection and admitted by the court at p. 12 of the trial transcript. However, instead of the

1/03/03 Lease, the only "Exhibit No. 4" included in the two exhibit binders transmitted to this Court is titled "Minutes for 10–6–2003." Although MSC lists the 2003 Mining Lease as an exhibit in three different motions in the record, only the first and last pages of the lease (marked as two consecutively-numbered pages) are attached to each motion. There is no explanation in the record for what appears to be an intentional removal of three of the five-page lease. The record shows no dispute between the parties over the precise rights granted to MSC by the 2003 Mining Lease. Because the parties' stipulation of the specific rights granted thereby are quoted in MSC's brief with record cite to Mr. Stewart's trial testimony re-affirming the "joint stipulation", which fact is again not challenged in Town's Answer Brief, we accept these uncon-

¶ 8 In April 2003, MSC employed Terry Fox from Triad Environmental to prepare its Application for a mining permit for submission to the Oklahoma Department of Mines (ODM), during which Fox determined there was no zoning affecting the 2003 Mining Lease. MSC "submitted its Application [for Non–Coal Permit] with ODM then on June 25, 2003," which described certain property in the 2003 Mining Lease (Fitzhugh Site). JSF # 3. Following ODM's required publications of notice, "individuals objecting to MSC's Application requested an informal conference," held November 4, 2003, at which the objectors expressed their opposition to MSC mining the site and their intent to pass zoning ordinances to prohibit the mining. JSF # 6.

¶ 9 Mr. Stewart attended a town council meeting in February 2004 at which interim zoning was discussed, announced MSC would protect its rights, including the filing of a lawsuit against Town and its members. On February 10, 2004, MSC filed a declaratory judgment against Town in Pontotoc County District Court (Case No. C–04–121),[4] seeking to establish Town was not properly incorporated in 1985 and lacked authority to enact zoning ordinances. The trial court disagreed and granted Town's summary judgment motion, finding Town's incorporation was valid, notice of such had been posted and duly published, and there was no annexation. MSC moved for a new trial.

¶ 10 "On November 19, 2004, ODM issued a Notice of Departmental Decision," as modified, granting MSC a mining permit which would become final in 30 days *unless* timely written requests for a hearing were filed.

JSF # 9. "On December 17, 2004, residents of [Town] requested a formal conference in the ODM matter." JSF # 10.

¶ 11 "On December 27, 2004, the Town's Trustees voted on the First Zoning Ordinance." JSF # 11. That Ordinance prohibited, *inter alia,* "any person, firm or corporation ... to establish, open up, commence or carry on any commercial ... quarry or surface mine within the corporate limits of [Town]." The First Zoning Ordinance, published January 6, 2005, included a grandfather clause for nonconforming uses as required by state law.[5] "There were no zoning restrictions in [Town] prior to December 2004." JSF # 1.

¶ 12 On January 10, 2005, Chuck Barton and other individuals filed an action against MSC and its parent corporation, Stewart Stone, in Pontotoc County District Court, (Case No. C–05–27), seeking a determination the First Zoning Ordinance was valid and requesting a permanent injunction prohibiting MSC from operating its proposed mine (Barton case). JSF # 14. Eight days later in the ODM administrative proceeding, counsel for the objecting parties "requested the ODM Administrative Law Judge [ALJ] take judicial notice that there had been a valid zoning passed on December 27, 2004, which prevented MSC from mining the [Fitzhugh] Site." JSF # 15. "In accordance to OAC 460:10–9–4, ODM cannot issue a mining permit which will violate a zoning statute." JSF # 13.

¶ 13 On January 24, 2005, MSC filed a petition against Town and its five Trustees in

troverted admissions in the parties' briefs as material supplementing the record. *Deffenbaugh v. Hudson,* 1990 OK 37, ¶ 4, 791 P.2d 84, 85.

4. This opinion was not included in the record although the judgment on appeal includes findings regarding C–04–121. Appellate courts can take judicial notice of its own records in litigation interconnected with an appeal before it. *House of Realty, Inc. v. City of Midwest City,* 2004 OK 97, n. 1, 109 P.3d 314.

5. In pertinent part, 11 O.S.2001. § 44–107.1(A) states "[t]he lawful conforming use of a building, structure or premises as such existed at the time of the adoption and recording of any ordinance

affecting it, may be continued, although such use does not conform with the provisions of such ordinance" and "the municipality may provide for the termination of lawful nonconforming uses either by specifying the period or periods within which such use shall be required to cease ..." Part II of First Zoning Ordinance and its two successors, in relevant part, similarly provides "[a]ny existing non-conforming use, as of the time this ordinance is enacted, may continue for a period not to exceed five years, unless some longer period may be shown by the owner to be required to reasonably amortize the actual investment in such activity as of the time this ordinance is enacted" and "[i]n no event, shall such longer period of amortization exceed ten (10) years from the date of this ordinance."

the Pontotoc County District Court (Case No. C–05–50), alleging, *inter alia,* intentional interference with contract and with its prospective business, an unconstitutional taking of its property interest, and a declaratory judgment of the validity and application of the First Zoning Ordinance. JSF # 16.

¶ 14 "On February 6, 2005, Town's Trustees passed the Second Zoning Ordinance, and it was published February 14, 2005." JSF# 17. "The Second Zoning Ordinance did not comply with publication requirements of the Open Meetings Act." *Id.* On March 1, 2005, MSC filed a counter-claim in the Barton Case (C–05–27), re-alleging its two intentional interference theories of recovery against individual plaintiffs, which MSC later amended to include declaratory judgment concerning the validity of both zoning ordinances. JSF # 18.

¶ 15 A week before the formal hearing scheduled in the ODM administrative proceeding concerning MSC's mining permit, MSC filed a motion on April 4, 2005, seeking a stay of such proceeding until a decision on the validity of Town's zoning ordinance in district court. Three days later, the ODM ALJ granted the stay.[6]

¶ 16 In May of 2005, MSC filed an appeal with the Supreme Court from the trial

court's April 2005 order denying MSC's motion for new trial in C–04–121 (challenge to Town's incorporation in 1985). Another division of the Court of Civil Appeals (Case No. 102,081) affirmed the court's denial in October 2005 by an unpublished opinion, finding MSC's challenge to Town's 1985 incorporation was time-barred under 11 O.S.2001 § 2–107.

¶ 17 On November 3, 2005, the trial court filed an order consolidating MSC's Case No. C–05–50 with the Barton Case (C–05–27).[7] In January 2006, the Supreme Court denied MSC's petition for certiorari in No. 102,081 (C–04–121), and mandate was subsequently issued. On February 10, 2006, MSC filed a limited dismissal without prejudice of all its theories of recovery alleged in the consolidated cases except for its request for declaratory relief.

¶ 18 "On April 3, 2006, Town voted on and enacted its Third Zoning Ordinance." JSF # 22. On June 4, 2007, MSC requested a variance of the subject property at a regular town meeting, which Town denied. JSF # 23 & 24. That same year MSC filed two amended petitions and counterclaims to include, *inter alia,*[8] all the theories of recovery it had previously dismissed.[9]

---

6. Pursuant to the Order Granting Applicant's Motion to Stay, the Objectors and Town, who were ordered to respond to MSC's Motion to Stay, each "stipulated that the Motion to Stay should be granted." R. p. 745. After striking the trial, the order states "[t]his case is stayed pending a final determination in three cases pending in the District Court of Ponotoc County *in which issues pertinent to the instant case* may be decided: Case No. C–05–27; C–05–50; and C–04–121. When these matters are concluded, counsel are directed to file a Motion to Lift Stay and advise whether the application is withdrawn or whether the case should be reset for trial."

7. The court expressly found after review of the records in the two cases that "both cases involve the validity and/or enforceability of a zoning of [Town], and related claims. Many, if not all, of the same facts and legal issues are involved in each of the two cases." He then found "the interests of justice and judicial economy will be served if the two cases are consolidated for purposes of pretrial proceedings (including discovery) and for trial."

8. An appeal from Town's denial of its variance was added as MSC's Fifth Cause of Action in its Second Amended Petition & Counterclaim filed

July 18, 2007. Over the next year, MSC's request for district court review of Town's denial was neither raised nor argued in the parties' subsequently-filed motions to dismiss and motions for summary judgment. However, in MSC's Response & Objections to Town's summary judgment motion, MSC reaffirmed that "[s]ince the time of [the latter motion], MSC has amended its causes of action" and listed as the first of three, "the zoning ordinances were *unreasonable, arbitrary or constitutes an unequal exercise of police powers and reversal of the order as it applies to MSC.*" The affirmed judgment on appeal necessarily disposes of that cause of action.

9. MSC realleged in both amended petitions its separate causes of action for intentional interference of contract and with prospective business. We note for the record there is no dismissal of MSC's tort claims in the appellate record or listed on the appearance docket. However, MSC expressly stated in its Response and Objection to Defendant's Motion for Summary Judgment filed October 11, 2010, that "[s]ince the filing of Defendant's [latter motion] MSC has amended its causes of action," to the following: the ordinances are unreasonable and arbitrary (see fn. 8), MSC has a vested property right, and inverse

¶ 19 For reasons not shown in the record, no action was taken by any party in the consolidated cases between the end of 2008 through until July 19, 2010, when the court's Pretrial Conference Order was filed.[10] The latter order lists only MSC's inverse condemnation/taking theory and request for declaratory judgment over the validity of Town's first two zoning ordinances, which MSC alleged were "fatally flawed" pursuant to 11 O.S.2001 § 43–104.[11]

¶ 20 A year later, MSC and Town agreed to submit three questions to the court for declaratory judgment, listed in the Pretrial Conference Order filed July 18, 2011:

1) Was the zoning enacted by the Town of Fitzhugh proper as it relates to MSC as lessee?

2) Is MSC entitled to a non-conforming use designation pursuant to *Bankoff* [*v. Board of Adjustment of Wagoner County*, 1994 OK 58, 875 P.2d 1138]?

3) Which party prevails in a balancing of the equities test in *Bankoff*?

¶ 21 At the declaratory judgment hearing held in August 2011 to decide the same three questions, the trial court expressly adopted the parties' joint stipulated facts attached to its last PTC Order. MSC called two witnesses, Larry Stewart, and an employee of ODM, Brett Sholar. After MSC rested and the court denied Town's demurrer to the evidence, Town called one witness, Joe Bradshaw, a Town Trustee for over twenty years. Both parties submitted numerous exhibits the court admitted into the record. Following closing statements, the parties were ordered to prepare proposed findings of fact and conclusions of law by a set date.

¶ 22 Relying on certain joint stipulated facts and trial testimony, the trial court made numerous findings of facts and in the Judgment's final paragraph expressly found:

[MSC] never received a mining permit for the Fitzhugh site, consequently [MSC] *never had a vested property right to mine* at the Fitzhugh site. The zoning ordinances for [Town] which in effect prohibited [MSC] from mining at the Fitzhugh site are valid and did not take a vested property right of [MSC]. (Emphasis added.)

The court then entered judgment in favor of Town and against MSC, whose appeal followed.[12]

## ANALYSIS

¶ 23 Six of MSC's seven propositions in its Brief in Chief may be reduced to two alternative arguments:[13] 1) Town's Third Zoning

---

condemnation. MSC then conceded "[a]ccordingly, this renders Town's motion for summary judgment moot" as to its first three propositions "as these are all related to argument for claims of torts." Because MSC's response contains citations to legal authority as well as argument, it is in substance a brief and will be treated as such for purposes of supplementing the record. *Casey v. Casey*, 2005 OK 13, ¶ 13, n. 2, 109 P.3d 345.

**10.** MSC claims in the "Statement of Facts" in its Brief in Chief that "by July 19, 2010, the Court had determined the issues within the consolidated cases were to be bifurcated for trial. Initially the Court would determine the validity of the zoning changes and depending on the outcome subsequently determine the remaining issues in the consolidated case for trial purposes." The footnote to this statement explains, "Although there was not a specific order to this effect, the First Pre-trial Conference Order filed on July 19, 2010, only listed MSC and the Town of Fitzhugh as parties to the case."

**11.** MSC raised in its Petition in Error the court's failure to find the first two zoning ordinances were "fatally flawed" and "were void" and also that he "improperly allowed for all of the ordi-

nances to be retroactively applied to [MSC]." Because MSC failed to brief those alleged errors, such issues are deemed waived. Okla.Sup.Ct. R.1.11(k)(1).

**12.** In its Answer Brief, Town contends, without record citation, that MSC "dismissed all counts that would have required a jury trial and instead decided to proceed under a theory of declaratory judgment and equity." MSC does not dispute that contention in its Reply Brief, which is confirmed by the record, *i.e.*, MSC eliminated its "inverse condemnation/unconstitutional taking" theory of recovery in the final PTC Order filed July 18, 2011, in which its lists two "theories of recovery," *i.e.*, "determination the first two zoning ordinances are 'fatally flawed' pursuant to 11 O.S. § 43–104" and "MSC is a non-conforming use if zoning ordinance is found to be proper" and for its "Damages/relief sought," declaratory judgment and attorney fees. Nevertheless, the affirmed judgment on appeal, by implication, disposes of that theory of recovery.

**13.** Six of MSC's propositions allege: 1) Town's enactment of its zoning ordinance in 2006 cannot be retroactively applied to MSC; 2) its min-

Ordinance cannot be applied retroactively to MSC because its mining lease is a constitutionally-protected vested property right, and 2) even if the lease is not vested, it would be inequitable to give effect to that zoning ordinance based on application of the "balancing of equities test" adopted in *Bankoff* to the facts of this case. Town correctly points out MSC has expressly conceded the validity of the Third Zoning Ordinance.

 ¶ 24 To support MSC's position that its mining lease is a *vested* property right entitled to constitutional protection, it cites to several Oklahoma inverse condemnation cases, the first of which similarly involved the lessee's *intended use* of a mining leasehold interest,[14] whereas the last two clearly involved leasehold interests which *uses* thereof had *existed lawfully* for many years.[15] "It is axiomatic that under ordinary circumstances a zoning enactment *cannot be applied retroactively* to require destruction of an *existing* structure or a substantial change in an *existing lawful use* of property." (Emphasis added.) *Bankoff v. Board of Adjustment of Wagoner County*, 1994 OK 58, ¶ 8, 875 P.2d 1138. However, none of the three cases addresses the specific issue raised in this case—does MSC's mining lease constitute a vested property right such as would prevent retroactive application of Town's subsequently-enacted zoning ordinance.

ing lease is a vested property right protected under Art. II, § 24, of the Oklahoma Constitution; 3) *Bankoff* applies to MSC; 4) MSC prevails under balancing of equities test applied by *Bankoff;* 5) MSC incurred substantial expenditures upon reliance of the zoning laws as they existed in 2003; and 6) Town's admitted acts of bad faith must be considered. See fn. 1 for this Court's rejection of MSC's seventh proposition.

14. *See Material Service Corporation v. Rogers County Commissioners*, 2006 OK CIV APP 52, 136 P.3d 1063 (summary adjudication order reversed because the issue whether the county's annexation and zoning ordinances substantially impaired the plaintiff's mining lease was one of fact for the finder in a trial on the merits). We assume from the limited facts in that case and claim for economic damages for "being prohibited from mining the subject property for 3 years", that the plaintiff's *proposed use* of mining its leasehold interest never came to fruition, resulting in its allegation that the county's zoning and land use regulations constituted an "unconstitu-

¶ 25 MSC also relies on Oklahoma's long-observed definition of a "vested right" as "the power to do certain actions or possess certain things *lawfully*, and is substantially a property right ... created by common law, by statute, or by contract" and "when it has been once created, and has become absolute, it is protected from the invasion of the Legislature by those provisions in the Constitution which apply to such rights." *Baker v. Oklahoma Firefighters Pension and Retirement System*, 1986 OK 8, ¶ 4, 718 P.2d 348.

 ¶ 26 Property rights "are created by common law, by statute, or by contract." *Id.* In this case, MSC's property rights were created by the 2003 Mining Lease. A "lease is a contract between the lessor and lessee....[that] becomes a grant of an estate in real property *when it takes effect in possession.*" *Ferguson v. District Court of Oklahoma County*, 1975 OK 167, ¶ 6, 544 P.2d 498, 499. During a lease, "the lessee holds an outstanding leasehold in the premises *which for all practical purposes is equivalent to absolute ownership.* The estate of the lessor during such time is limited to his reversionary interest which ripens into perfect title at the expiration of the lease." (Citations omitted.) *Id.*

. ¶ 27 We agree a leasehold interest is generally a valuable property interest which in Oklahoma, if taken by inverse con-

tional taking" of such interest. Although MSC originally plead the latter theory in this case, it was deleted from the Pretrial Conference Order filed July 18, 2011, which expressly limited MSC to declaratory relief.

15. *Wilkerson v. City of Pauls Valley, Oklahoma*, 2001 OK CIV APP 66, 24 P.3d 872 (plaintiff, who had operated a mobile home park under a lease of land located in a flood plain long before the city adopted flood prevention ordinances for years before the enactment of zoning, had a vested right consisting of a continual nonconforming use of an existing mobile home park but no vested right to replace trailers or install new ones absent compliance with those ordinances); *Perkins Whistlestop, Inc. v. State ex rel. Dept. of Transportation*, 1998 OK CIV APP 7, ¶ 10, 954 P.2d 1251, 1254 (leasehold owner of one acre tract had standing to sue the state since "[a] leasehold interest may be subject to a taking and the leaseholder may have a cause of action in inverse condemnation.")

demnation, the lessee has a right to share in the award, absent an agreement to the contrary with the lessor. *State ex rel. Oklahoma Capitol Improvement Authority v. United States Beef Corp.*, 2002 OK CIV APP 81, ¶ 6, 52 P.3d 1052, 1054. However, "rights are vested when the present or prospective right to enjoyment has become the property of some particular person as a present interest." *Randolph v. Board of Regents of Oklahoma Colleges*, 1982 OK 75, ¶ 7, 648 P.2d 825, 827. "*Contrarily*, rights are contingent when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent vesting." (Emphasis added.) *Id.*

¶ 28 At the declaratory hearing, Mr. Stewart, affirmed the parties' joint stipulation by testifying "the only right he had in the mining lease was the *right to mine or quarry rock*." [16] In Oklahoma, "the existing applicable law is part of every contract as if it were expressly referred to or incorporated within the agreement." *Welty v. Martinaire of Oklahoma, Inc.*, 1994 OK 10, ¶ 11, 867 P.2d 1273, 1276. "A state may impose statutory limits on the right to contract where the limitation is a reasonable exercise of its police power, and in such case the statute is an implied part of the contract, with obligations subject to the prohibitions in the statute." *Id.*

¶ 29 Pursuant to Oklahoma's Mining Lands Reclamation Act (the Act), 45 O.S.2001 § 724(A), the version in effect when the 2003 Mining Lease was executed in 2003, "it *shall be unlawful* for any operator *to engage* in any mining operations in this state *without first obtaining a permit* ... from the Oklahoma Department of Mines for each separate mining operation." (Emphasis added.) The public policy of the Act, provides, *inter alia*, for the reclamation and conservation of land subjected to surface disturbance by mining, preservation of natural resources, to prevent erosion, and to protect and promote the health, safety and general welfare of the people of this state. 45 O.S.2001 § 722.

¶ 30 MSC, as owner and operator of numerous limestone mines throughout Oklahoma for many years and with extensive predominantly successful experience with the ODM permit process, does not dispute the Act's mandatory permit is a reasonable exercise of this state's police powers. However, MSC's claim to a *vested* property right fails to consider the result of § 724(A) being an implied part of its 2003 Mining Lease—its *right to mine* granted by that lease "will only come into existence upon an event or condition which may not happen," in other words, it is contingent on MSC obtaining the statutorily-required permit from ODM.

¶ 31 As the record and trial testimony reveals, ODM's Notice of Department Decision (Notice) approved MSC's application for the mandated § 724(A) permit "as modified," which expressly detailed four "conditions" applicable to the 2003 Mining Lease. Also relevant is the Notice's provision that "any person with an interest may request a formal hearing ... [which] must be filed with [ODM] in writing within thirty (30) days of receipt of this notice. If no request is received, the decision of the [ODM] will become final." Thus, MSC's right to receive the permit was clearly contingent on several conditions or events, one of which the record demonstrates undisputedly occurred in this case, *i.e.*, the timely filing of a written request for a formal hearing by those objecting to the Notice.

¶ 32 It is also stipulated by the parties that five days prior to the formal hearing scheduled in April 2005, the ODM permit proceeding was stayed at MSC's request. Although MSC's witness, Mr. Scolar, confirmed he had never witnessed during his nine and one-half years at ODM a denial of a permit after ODM's initial recommendation to grant one and a formal hearing, he later admitted that new issues may be raised at the formal hearing on ODM's decision, and therefore obtaining the permit was not guaranteed. As a result, we agree the trial court correctly concluded MSC, without having obtained a permit to mine, never had a *vested right to*

---

**16.** While mining is the all-encompassing term, extracting hard rock is commonly referred to in the industry as "quarrying." *See Sierra Club v.* *County of Sonoma*, 6 Cal.App.4th 1307, 1313–1314, 8 Cal.Rptr.2d 473 (1992).

mine. Cf. *Gonzales v. City of Oklahoma City*, 2010 OK CIV APP 62, 238 P.3d 954 and *Miller v. Gonzales*, 2010 OK CIV APP 56, 239 P.3d 163 (both holding a constitutionally protected vested right does not arise from one's mere pursuit of a license and engaging in an effort to satisfy all applicable requirements for licensure).

■ ¶ 33 Our analysis does not end with affirming the express part of the court's judgment in light of MSC's alternative argument, *i.e.*, even if it does not have a vested property right, it prevails under *Bankoff's* balancing of equities test. Importantly here, the Court in *Bankoff* first recognized that "a property owner does not have a *vested interest or right* in the continuation of an existing zoning classification so that his *mere hope of developing the land in a particular way in the future* will not be protected against later zoning amendments." However, the Court then stated:

> Circumstances may occur, however, *which will give rise to judicial recognition of a property interest sufficient to protect the owner's intended use* from the reach of an otherwise applicable amendment to the zoning classification. In drawing that line between a landowner's hope for the *contemplated future development* of his land and an interest which the courts will recognize as vested and therefore protected, several judicial tests have evolved.

*Bankoff*, at ¶ 8. (Emphasis added)

¶ 34 The *Bankoff* Court then considered two balancing of equities tests, the first described as being used by "most courts":

> While a landowner will not be immune from a zoning change *if he has done nothing more than obtain a permit from the licensing authority*, he will be protected if he has *made substantial expenditures in reliance thereon*, or has *committed himself to his substantial disadvantage in reliance on the permit or zoning provisions before the amendment went into effect*, even though no construction has begun. (Emphasis added.) 1994 OK 58, ¶ 9, 875 P.2d 1138.

"Other courts," according to *Bankoff*, "without rejecting the general rule recognizing

vested interests, have also established a 'balance of equities' test as an alternative means of weighing and determining the respective interests of the property owner and zoning authority." *Id.*, ¶ 10.

¶ 35 "Under both tests," the *Bankoff* Court explained that the courts consider: 1) "the good faith of the landowner," 2) "the substantiality of the landowner's reliance on the existing zoning," 3) "the landowner has made substantial expenditures or committed himself to a substantial disadvantage in reliance thereon"; and 4) "the conduct of the licensing board," *i.e.*, whether the enacted zoning change was the result of maliciousness or if it was intended and directed toward the particular landowner and his intended use. *Id.*, ¶ 11.

¶ 36 Although recognizing some jurisdictions apply the existing zoning law at the time of the landowner's application when "there is evidence of bad faith, delaying tactics, prejudice or reliance," the Court in *Bankoff* declined to decide whether the Commission had acted in bad faith, and instead decided "the equities require finding that the [zoning] amendment did not apply to Bankoff [the landowner] and his intended use of the property." *Id.*, ¶ 14.

¶ 37 The Court in Bankoff similarly eliminated the need to decide whether the landowner's lessee, BFI, had a *vested right to use* the property as a landfill, holding "for even without such finding of a vested right, equitable considerations lead us to affirm the trial court's judgment in favor of BFI." Those equitable considerations were:

> [The landowner] had done everything legally required of him. The state had approved the proposal. The trial court had determined that the Board should have issued the [conditional-use] permit. *The Health Department had issued its permit. A substantial amount of money ($800,-000.00) had been spent on the project. But for the statutory automatic stay imposed by reason of the appeal*, the landfill would have been in *actual use*. (Emphasis added.) 1994 OK 58, ¶ 15, 875 P.2d 1138.

MSC contends the trial court's ruling disregards both its vested property right in the 2003 Mining Lease and the *Bankoff* Court's

last "but for" consideration. Like the landowner and lessee in *Bankoff*, MSC also contends it also spent substantial expenditures toward its Business Plan in reliance on Fitzhugh's zoning laws as they existed in 2003 and it acted in good faith at all times, unlike Town, which admitted acts of bad faith, *e.g.*, its intent in creating the zoning ordinance was to prevent MSC from mining. Despite admitting "several key distinctions" between *Bankoff* and the "instant case," [17] MSC nevertheless contends it prevails under the balancing of equities test.

¶ 38 Assuming, without deciding, that *Bankoff*'s balancing test is applicable here,[18] we disagree based on the joint stipulations and the trial testimony that the equities here require finding Town's zoning ordinances do not apply to MSC. Despite MSC's alleged substantial expenditures ($349,178.54), argued in reliance on Town's existing zoning in 2003, the trial court heard abundant conflicting testimony. MSC admitted execution of the 2003 Mining Lease in Pontotoc County accomplished part of its business plan created in 2000 to build a portable rock crusher that could be transported between two different quarries. At the time MSC obtained the 2003 Mining Lease in Pontotoc County, it had already had a mining lease in Seminole County and had made substantial monetary investments in building the portable rock crusher at its plant in Pawnee. The trial court made numerous findings of fact, which MSC does not challenge on appeal, regarding 1) the timing and amount of MSC's expenditures on building the portable rock crusher years prior to finding and/or executing the

2003 Mining Lease, during which negotiations MSC admits it first was told by the Lukes there were no zoning restrictions for their property, and 2) of its continued expenditures after MSC first learned the lease was inside Town's corporate limits in April 2003 and became aware in November 2003 of the intent of Town's leaders to enact zoning to prohibit mining within its corporate limits. Therefore the court's implied finding MSC's substantial expenditures were not made *in reliance on Town's lack of zoning ordinances* is not clearly contrary to the weight of the evidence.

## CONCLUSION

¶ 39 We therefore determine as a matter of law, MSC did not have a matured vested property right to mine rock. It had lease contract rights only as and between MSC and its lessor. Secondly, the trial court correctly applied the *Bankoff* equitable balancing test, took testimony and weighed the evidence in favor of Town. This determination is not against the weight of the evidence heard by this trial court, and we **AFFIRM**.

JOPLIN, P.J., and BUETTNER, J., concur.

---

**17.** In *Bankoff*: 1) the application of the landowner and lessee was for a conditional use permit (CUP) to operate a landfill, 2) the money spent toward the operation was in reliance on the county's allowance of a landfill operated by BFI across the street from the proposed landfill, 3) the county board denied the landowner's CUP application, 4) the landowner appealed the denial to the district court, who determined the board's decision was arbitrary and capricious, 5) during the board's appeal of that ruling to the Supreme Court, the state health department issued the permit to operate the landfill to the lessee and less than 20 days later, the county

amended the zoning ordinances which, if applicable, effectively rendered moot the CUP application and subsequent proceedings, and 6) the lessee then filed declaratory judgment suit challenging the validity of the amended zoning ordinance in district court. The two cases were then consolidated for trial purposes.

**18.** The *Bankoff* Court expressly limited its decision "as a narrowly-construed exception based strictly on equitable considerations given the facts peculiar to this case." *Id.*, 1994 OK 58, ¶ 16, 875 P.2d 1138.